STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP-21-007

ANGIE MARQUIS

      Petitioner

   v.

MAINE DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.

      Respondents

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ORDER ON PETITIONER'S 80C
APPEAL

Before the Court is Petitioner Angie Marquis' appeal of a final agency action brought pursuant to Maine Rules of Civil Procedure 80C. For the reasons set forth herein, Petitioner's appeal is DENIED.

## PROCEDURAL POSTURE

This case comes before the court on appeal of a final agency decision pursuant to M.R. Civ. P. 80C. Petitioner filed an 80C appeal with the court on March 2, 2021, after a decision by the Department of Health and Human Services' ("Department") Office of Administrative Hearings ("Hearing Office") to affirm Adult Protective Services' ("APS") Level I Substantiation of Petitioner for abuse and neglect of N.F. ("Mr. F."), a dependent, incapacitated adult.

## FACTUAL BACKGROUND

The following facts are taken from the record. Residential Community Support Services ("RCSS") is a Medicaid provider pursuant to Chapter II, Section 21 of the MaineCare Benefits

1

REC'D CUMB CLERKS OFC
OCT 4 '22 PM 1:45

Manual. *See* 10-144 CMR ch. 101 ("MBM"), Ch. II, § 21. (Certified Record ("CR") 1633, 2159.) In June 2019, RCSS hired Angie Marquis as its Director of Planning, Crisis, and New Development. (CR 18.) In August 2019, Ms. Marquis also served as RCSS' Acting CEO. (CR 2095.)

Mr. F. was a 62-year-old man with intellectual disabilities and a significant diabetic condition that required close monitoring and insulin injections several times per day. (CR 18, 1877, 1879-82.) Mr. F. also had other complex medical, behavioral, and ambulatory needs. (CR 1877.) The State of Maine was Mr. F.'s legal guardian. (CR 1980.) Mr. F.'s primary State contact was his "guardian representative," Patrick Bourque. (CR 1980.) His services and benefits were also monitored by his case manager, Kelsey Best. (CR 1875.)

Before he became an RCSS client, Mr. F. lived independently with in-home support services. (CR 1898.) On August 20, 2019, Ms. Best contacted RCSS for a potential Section 21 placement because Mr. F. had been discharged from his home support program. (CR 1904.) Without home support, Mr. F.'s blood sugar levels had been unstable, and there were concerns about his diet and whether he was taking his medications and insulin consistently. (CR 1898-1900.) Ms. Best and Mr. Bourque determined that it was not safe for Mr. F. to continue living without direct supervision. (CR 18.)

On Thursday, August 22, 2019, Ms. Best and Mr. Bourque went to Mr. F.'s home and persuaded him to go to the emergency room for an evaluation. (CR 1901-02.) Ms. Best again contacted Ms. Marquis to ask whether RCSS had found an available placement that would be appropriate for him. (CR 1908.) Ms. Marquis confirmed with Ms. Best that RCSS had a home available that would meet Mr. F.'s needs. (CR 2102.) Ms. Marquis then went to the hospital to complete the intake process. (CR 2154.)

2

Ms. Marquis briefly met with Mr. F and Mr. Bourque before sitting down with Ms. Best to complete the intake. (CR 1908-09, 2155.) Ms. Best provided Ms. Marquis with information pertaining to Mr. F.'s complex medication needs, his need for frequent insulin injections, and his need for regular blood sugar level testing. (CR 1877, 2155, 2157.) Ms. Marquis assured Ms. Best that RCSS' nurse would train the staff in Mr. F.'s group home on how to monitor and manage his diabetes, including how to provide regular insulin injections. (CR 1882.) Ms. Marquis said the training would happen prior to Mr. F's arrival. (CR 1882-83.)

Ms. Marquis then informed Flora Mugeni, RCSS' Registered Nurse, that Mr. F. would be arriving at RCSS' 11 Humboldt Street home the next day and that all staff at that location would require diabetes training to be able to administer his insulin. (CR 2108.) Ms. Mugeni responded that she would prefer to wait until Mr. F. arrived at the home so that she could train the staff based on the specific insulin and blood sugar testing machine that he used. (CR 2109-10.) Ms. Marquis agreed to that timing. (CR 2110.)

The transition into RCSS care was difficult. Mr. F.'s transport to RCSS was delayed until Saturday because his blood sugar levels were not stable. (CR 1891, 2115, 2117.) He was met with fewer staff than intended. (CR 18.) He arrived without doctor's orders, which meant that the staff could not administer his medications. (CR 1669.) He arrived without insulin. (CR 2139.) There was no food at the home for him. (CR 2121.)

Within a few hours of his arrival, Mr. F. began exhibiting symptoms of low blood sugar. (CR 2123.) RCSS' nurse remotely instructed the staff to give him soda, but she did not go to the house to test his blood sugar levels, nor was she instructed by Ms. Marquis to do so. (CR 2123, 2184-85.) The situation with his missing insulin was not resolved, and he continued to go without

3

insulin on Sunday. (CR 1685.) Although Mr. F. missed at least five doses of insulin over the weekend, no missed doses were reported to the Department, as is required. (CR 18, 32.)

On Monday, August 26, 2019, Ms. Marquis learned that Mr. F. had not received any insulin since he arrived at the RCSS group home. (CR 2138-39.) She decided to step back from the situation and allow her staff to decide on a course of action. (CR 2175-76.) The course of action they chose was to wait until Mr. F. could see his primary care physician on Tuesday morning, allowing him to go another day without insulin and without RCSS' nurse observing him or testing his blood sugar levels. (CR 1685, 2137, 2143.)

On Tuesday, August 27, 2019, at 8:56 a.m., Ms. Marquis learned that Mr. F. was refusing to go to his doctor's appointment. (CR 2146-47.) At 10:31 a.m. she learned that Mr. F. was "just rolling over on the floor and not saying anything." (CR 2149.) RCSS' nurse asked Ms. Marquis if she should contact Crisis. (CR 2149.) Ten minutes later, Ms. Marquis responded that Mr. F. "probably needs to go to the ER." (CR 2150.) Ms. Mugeni responded that she had just spoken with RCSS' Director of Nursing, who was out on medical leave, and that the two of them had decided that Ms. Mugeni would call Crisis and let them arrange rescue services. (CR 2150.) Ms. Marquis responded, "Okay." (CR 2151.)

At 12:30 p.m., Ms. Mugeni informed Ms. Marquis that Mr. F. had lost his pulse, that CPR was being performed, and that 911 had been called. (CR 2152.) The next communication Ms. Marquis received was that Mr. F. had passed away. (CR 2152.)

On August 27, 2019, APS received a referral regarding possible abuse or neglect of Mr. F. by RCSS facility staff leading to his death. (CR 377-82.) APS conducted an investigation, and on March 4, 2020, it issued a Notice of Level I Substantiation to Ms. Marquis. (CR 129.) Specifically, APS concluded:

4

> [T]he facts support a finding by a preponderance of the evidence that Angie Marquis failed to ensure that Mr. F. received necessary medication, failed to ensure that his health and welfare were appropriately monitored, and failed to initiate an emergency response. As a result, Angie Marquis knowingly or recklessly caused a threat to Mr. F.'s health or welfare and engaged in abuse or neglect that resulted in serious harm to Mr. F.

On March 13, 2020, through counsel, Ms. Marquis appealed the substantiation by submitting a Level I Substantiation Fair Hearing Form. (CR 130-31.)

After a three-day hearing in November 2020, the Hearing Officer issued a detailed Recommended Decision concluding that the Department had correctly found a Level I Substantiation. (CR 12, 33.) His conclusions and factual findings were adopted in a Final Decision by the Department. (CR 1.) The Final Decision concluded: "Ms. Marquis' actions and failures to act support a substantiation for abuse or neglect at a Level I." (CR 3.) Ms. Marquis now asks this Court to rescind or reduce the substantiation.

## 80C STANDARD OF REVIEW

In Rule 80C appeals, the court's review is "limited to whether the governmental agency abused its discretion, committed an error of law, or made findings not supported by substantial evidence in the record." *Seider v. Board of Examiners of Psychologists*, 2000 ME 206, ¶ 8, 762 A.2d 551 (cleaned up). The court will sustain an agency's decision if "on the record before it, the agency could have fairly and reasonably found as it did." *Id.* ¶ 9. The court may reverse or modify an agency's decision if it (1) violates a constitutional or statutory provision; (2) exceeds the agency's statutory authority, (3) is procedurally unlawful, (4) is affected by bias or error of law; (5) is not supported by substantial evidence on the record; or (6) is arbitrary or capricious or an abuse of discretion. 5 M.R.S. § 11007(4)(C)(1)-(6).

5

The court shall not substitute its judgment for that of the agency on questions of fact. 5 M.R.S. § 11007(3). Questions of law are reviewed de novo, but the court still cannot substitute its judgment for that of the agency. *Doane v. Dep't of Health and Human Servs.*, 2021 ME 28, ¶ 15, 250 A.3d. 1101. Because of a state agency's professional and often technical expertise, a reviewing court must give considerable deference to the agency's interpretation of its own rules, regulations, and procedures and will not set aside the agency's findings unless the rule or regulation plainly compels a contrary result or the rule interpretation is contrary to the governing statute. *Beauchene v. HHS*, 2009 ME 24, ¶ 11, 965 A.2d 866. *See also Isis Development, LLC v. Town of Wells*, 2003 ME 149, ¶ 3 n.4 836 A.2d 1285.

## DISCUSSION

On appeal, Petitioner Marquis argues that the Department's decision should be vacated for four reasons. First, Ms. Marquis alleges that the Department's decision is not supported by substantial evidence in the record. Second, she alleges that the Department's decision was tainted by bias. Third, she alleges that the Department's decision was arbitrary and capricious. Lastly, Ms. Marquis alleges a violation of her right to procedural due process.

## I.    Substantial Evidence

Petitioner Marquis claims that the Department's decision is not supported by substantial evidence and asks that her substantiation be rescinded or reduced. As stated above, the Court's role in this proceeding is to determine whether the Department "abused its discretion, committed an error of law, or made findings not supported by substantial evidence in the record." *Seider*, 2000 ME 206, ¶ 8, 762 A.2d 551 (cleaned up). In order to vacate the Department's decision, the Court must determine that no competent record evidence exists to support the decision. *Dowling v. Bangor Hous. Auth.*, 2006 ME 136, ¶ 9, 910 A.2d 376. Having found ample evidence in the

6

record to support the Department's decision, this Court declines to rescind or reduce Ms. Marquis' Level I Substantiation.

A Level I Substantiation is a finding by a preponderance of the evidence that the substantiated person has "Abused, Neglected, or Exploited an individual with intellectual disability or autism" in one of several ways. 10-149 C.M.R. ch. 1, § 7(2)(a)(i). Relevant to this proceeding are the following:

> 4. Intentionally, knowingly, or recklessly causing a threat to the health or welfare of an individual with intellectual disability or autism by physical or mental injury or impairment, deprivation of essential needs, or failure to protect from these;
>
> 5. Intentionally, knowingly, recklessly, or negligently engaging in abuse or neglect that results in serious harm to an individual with intellectual disability or autism[.]

*Id.* § 7(2)(a)(i)(4)-(5). The rules adopt the criminal definitions of "intentionally," "knowingly," and "recklessly," found in 17-A M.R.S. § 35. The rules do not adopt the criminal definition of "negligently," and the Final Decision finds that the correct standard for "negligently" is that of civil negligence.

A.     Recklessness

Ms. Marquis argues that the facts of this case do not support the Department's finding of recklessness. Specifically, she claims that there are no factual findings from which the Court can infer that she had a culpable state of mind. The Court disagrees. The Hearing Officer determined that Ms. Marquis "neglected [Mr. F.] by recklessly causing a threat to his health or welfare by deprivation of essential needs and failure to protect from these." That recommendation was adopted in the Final Decision, which rejected Ms. Marquis' argument that recklessness was not established, finding that "Ms. Marquis' actions and failures to act rise to the level of recklessness described by the Law Court in *State v. Watson*, 2000 ME 77, 751 A.2d 1004" (describing

7

recklessness as the conscious disregard of a risk that, in light of the circumstances, constitutes a gross deviation from the conduct of a reasonable person).

The record supports the Department's finding of recklessness. Ms. Marquis was aware of Mr. F.'s complex medical needs, including his needs for regular blood sugar level monitoring and multiple daily insulin injections. By Monday, August 26, 2019, Ms. Marquis knew that Mr. F. had not received a single insulin injection since arriving at the RCSS group home, and yet Ms. Marquis agreed to a plan in which Mr. F. would go another day without insulin or blood sugar level testing, consciously depriving him of his essential needs.

Ultimately, Ms. Marquis knew, beginning on Monday at the latest, that Mr. F.'s health was at risk due to insulin deprivation, and her decision to disregard that risk was not just unreasonable, it was a gross deviation from the conduct of a reasonable person. There is competent record evidence to support the Department's determination that Ms. Marquis recklessly caused a threat to Mr. F.'s health and welfare.

B.    Negligence

Ms. Marquis further argues that the facts of this case do not support the Department's finding that she was negligent. She contends that the record lacks substantial evidence establishing duty, breach, and causation.[1] The Hearing Officer determined that Ms. Marquis "neglected [Mr. F.] because her reckless and negligent conduct resulted in serious harm to [Mr. F]." (CR 30.) The Final Decision adopted the recommendation, rejecting Ms. Marquis' argument that the Department had failed to establish that she was negligent, and found that "the record amply supports a determination that the Department established all four elements of negligence." (CR 2.)

---

[1] Ms. Marquis does not contest injury, as it is clear in this case that Mr. F. passed away.

8

The record supports the Department's finding of negligence. First, there is sufficient evidence that Ms. Marquis had a duty to Mr. F. A legal duty is "an obligation, to which the law will give recognition and effect, to conform to a particular manner of conduct toward another." *Quadrino v. Bar Harbor Banking & Trust Co.*, 588 A.2d 303, 304 (Me. 1991) (quoting *Howe v. Stubbs*, 570 A.2d 1203, 1203 (Me. 1990)). Whether a duty of care exists is a question of law. *Reid v. Town of Mt. Vernon*, 2007 ME 125, ¶ 14, 932 A.2d 539. Although questions of law are reviewed de novo, the court will not substitute its judgment for that of the agency. *Doane*, 2021 ME 28, ¶ 15, 250 A.3d. 1101.

At the time when these events occurred, Ms. Marquis was both RCSS' Director of Planning, Crisis, and New Development and its Acting CEO. She personally conducted Mr. F.'s intake process, arranged for his placement, and assured his case manager that Mr. F.'s needs would be met. After Mr. F. arrived at the RCSS group home, Ms. Marquis continued to maintain a supervisory role over the staff who worked directly with Mr. F, repeatedly answering their texts, calls, and emails with instructions and advice. Ms. Marquis' role in RCSS, her role as Mr. F.'s intake coordinator, and her role as supervisor of Mr. F.'s other caretakers each provide a basis to find that she owed Mr. F. a duty of care.

Second, there is sufficient evidence that Ms. Marquis breached her duty to Mr. F. Whether a duty has been breached is generally a question of fact. *Reid*, 2007 ME 125, ¶ 14, 932 A.2d 539. The Court cannot substitute its judgment for that of the agency on questions of fact. 5 M.R.S. § 11007(3). The Hearing Officer found that "Ms. Marquis's triage of [Mr. F.] and internal coordination with RCSS staff was an abject failure," and the record supports that finding. (CR 32.) Despite her assurances to Ms. Best, Ms. Marquis did not ensure that the staff at Mr. F.'s facility received diabetes training. She did not confirm that he had arrived with all of his medications. Ms.

9

Marquis did not even confirm that the RCSS nurse checked on Mr. F. over the weekend. On Monday August 26, when Ms. Marquis learned that Mr. F. had not received any insulin injections or had his blood sugar levels checked since his arrival, she abdicated her responsibilities and removed herself from the situation. The Hearing Officer found that Ms. Marquis' inaction at that time was unreasonable. (CR 32.) That finding is supported by the record.

Finally, there is sufficient evidence that Ms. Marquis' actions and inactions were a cause of Mr. F.'s death. Ms. Marquis does not appear to contest that her actions and inactions were among the actual, or "but for," causes of Mr. F.'s death. However, Ms. Marquis does contest proximate cause in this case. "Proximate cause is an action occurring in a natural and continuous sequence, uninterrupted by an intervening cause, that produces an injury that would not have occurred but for the action." *Cyr v. Adamar Assocs. Ltd. P'ship*, 2000 ME 110, ¶ 6, 752 A.2d 603. For a negligent act to be the proximate cause of an injury, the actor's conduct must be "a substantial factor in bringing about the harm." *Webb v. Haas*, 1999 ME 74, ¶ 20, 728 A.2d 1261. Proximate cause is generally a question of fact. *Id.*

Here, ample evidence supports a finding that Ms. Marquis' actions and inactions were a substantial factor in Mr. F.'s death. The record unfolds in a continuous sequence of mistakes and unreasonable decisions, from Ms. Marquis' initial failure to prepare for Mr. F.'s arrival, to her repeated communication failures, to her final, unreasonable decision to step away from the situation and allow her incompetent staff to manage what had already become a medical crisis. Ms. Marquis argues that there were other, intervening causes, such as the actions of Department employees or of Mr. F., himself.[2] The Final Decision addresses this argument, noting that "[t]he

_____

[2] The only specific act that Ms. Marquis references as a potential intervening cause in Mr. F.'s death is Mr. F.'s own refusal to attend his doctor's appointment on Tuesday morning. That appointment was scheduled for 9:45 a.m., less than three hours before his death. (CR 2137, 2152.) Essentially, Ms. Marquis argues that if Mr. F. had agreed to see his doctor, he would not have died. Even if that were true (which is not clear from the record), Ms. Marquis was

fact that other persons may have acted negligently or recklessly does not excuse Ms. Marquis' conduct...[m]ore than one person can be at fault." (CR 2.)

In sum, the Court finds that there is sufficient record evidence to support the Department's findings that Ms. Marquis neglected Mr. F. Accordingly, Petitioner's first ground on appeal fails.

## II.  Bias

Petitioner Marquis alleges that the Department's decision was the product of bias. As stated above, courts may reverse or modify an agency's decision if the administrative findings or conclusions were affected by bias. 5 M.R.S. ¶ 11007(4)(C)(4). To show bias, a party "must present evidence sufficient to overcome a presumption that the fact-finders, as state administrators, acted in good faith." *Friends of Maine's Mountains v. Bd. of Env't Prot.*, 2013 ME 25, ¶ 23, 61 A.3d 689. The party must also explain how they were prejudiced. *Hale v. Petit*, 438 A.2d 226, 234 (Me. 1981). Ms. Marquis has not presented sufficient evidence that the Department was biased, nor has she explained how she was prejudiced by the alleged bias.

Ms. Marquis essentially argues that she was substantiated because the Department needed a scapegoat to distract from the failures of its own employees. The record flatly contradicts this. It is abundantly clear that the primary bases for Ms. Marquis' Level I Substantiation were her own actions and inactions. Although the Hearing Officer and the Chief Hearing Officer both acknowledge that others may have made mistakes or acted negligently, both also make explicit findings that those other mistakes do not excuse Ms. Marquis' conduct. (CR 2, 32.)

---

informed at intake that Mr. F., a man with intellectual disabilities, had complex behavioral needs, including that he was noncompliant at times. (CR 1879, 2005.) Mr. F.'s actions on Tuesday morning were foreseeable, and thus do not absolve Ms. Marquis of her role in Mr. F.'s death. *Ames v. Dipietro-Kay Corp.*, 617 A.2d 559, 561 (Me. 1992) ("the mere occurrence of an intervening cause does not automatically break the chain of causation...the intervening cause must also be a superseding cause, that is, neither anticipated nor reasonably foreseeable").

Ms. Marquis mainly relies on the alleged lack of discipline of two Department employees, Mr. Bourque and Mr. Robbins, to support her theory of bias.[3] She theorizes that if neither Mr. Bourque nor Mr. Robbins were substantiated in this matter, the Department's investigation must have been affected by bias. There is another explanation: their conduct may not have warranted substantiation. The main evidence Ms. Marquis puts forth concerning Mr. Bourque is that he was the only person aware that Mr. F. would be discharged without insulin. The main evidence Ms. Marquis puts forth concerning Mr. Robbins is that he arrived at the RCSS group home 30 minutes before Mr. F.'s death but did not direct RCSS staff to call 911 until after RCSS' nurse checked Mr. F.'s blood sugar levels.

The evidence Ms. Marquis puts forth concerning bias is insufficient to overcome the presumption that the Department acted in good faith. The record does not support Ms. Marquis' arguments that the Department employees had a higher duty of care towards Mr. F. than she did or that the actions or inactions of the Department employees were substantially similar to her own. Neither Mr. Bourque nor Mr. Robbins were tasked with providing direct care for Mr. F, nor were they involved in the vast majority of Ms. Marquis' text, email, or phone conversations regarding Mr. F.'s health once he entered RCSS' care. The record does support the Hearing Officer's finding that once RCSS accepted Mr. F. as a client, it was RCSS' responsibility to administer and manage Mr. F.'s medication. Ms. Marquis arranged for Mr. F.'s placement, completed his intake, and supervised the staff who were providing his direct care, and she failed to ensure that he received his essential needs.

---

[3] Ms. Marquis also asks that the Court take judicial notice of several news articles that she claims are representative of press coverage of Mr. F.'s death, for the purpose of showing that the Department's actions were receiving public attention and scrutiny. The Court declines to take such notice. Judicial review of an agency decision is confined to the record upon which the agency's decision was based. 5 M.R.S. § 11006(1). Further, judicial notice may only be taken of facts not subject to reasonable dispute. M.R. Evid. 201(b). The news articles were not part of the record, and the parties dispute whether they are representative.

Ms. Marquis does not explain how she was prejudiced by the Department's alleged bias. Even if Ms. Marquis were able to provide clear evidence that the Department should have substantiated its own employees, the fact remains that there is ample evidence in the record to support Ms. Marquis' Level I Substantiation. The discipline, or lack thereof, levied against other actors has no bearing on whether Ms. Marquis' actions and inactions were deserving of substantiation.

In sum, the Court finds that the Department's decision to substantiate Ms. Marquis was not affected by bias. Accordingly, Petitioner's second ground on appeal fails.

## III. Arbitrary or Capricious

Petitioner Marquis claims that the Department's decision was both arbitrary and capricious. The "arbitrary or capricious" standard is high, and the Court will "not find that an administrative agency has acted arbitrarily or capriciously unless its action is 'willful and unreasoning' and 'without consideration of facts or circumstances.'" *AngleZ Behav. Health Servs. V. Dep't of Health and Hum. Servs.*, 2020 ME 26, ¶ 23, 226 A.3d 762, 768. The agency will prevail unless "the record compels contrary findings." *Kroeger v. Dep't of Env't Prot.*, 2005 ME 50, ¶ 8, 870 A.2d 566. The record in this case does not compel contrary findings. The Department's decision to substantiate Ms. Marquis was well-reasoned and based on detailed factual findings.

Essentially, Ms. Marquis argues that the Department made no explicit findings as to her mental state and therefore its determination that she acted recklessly is arbitrary and capricious. Ms. Marquis also contends that a finding of recklessness is at odds with one section of the Recommended Decision, in which the Hearing Officer states that none of the findings against Ms. Marquis were "based on an idea there was an ounce of malice or ill-will in her actions."

13

Contrary to Ms. Marquis' arguments, recklessness does not require a finding of ill-will; it requires a finding that Ms. Marquis consciously disregarded a known risk. The record here supports the Hearing Officer's findings that on Monday, August 26, 2019, when Ms. Marquis agreed to allow Mr. F. to go without insulin injections or blood sugar level testing until he could be seen by his primary care physician the next day, she knew that Mr. F. was an insulin-dependent diabetic who had not received a single insulin injection since arriving at the RCSS group home. Ms. Marquis knew that Mr. F.'s health was at risk and yet she chose not to act. She disregarded the risk.

In sum, the Department's findings of fact support a finding a recklessness. Accordingly, Petitioner's third ground on appeal fails.

## IV.    Due Process

Finally, Petitioner Marquis alleges that she was deprived of her constitutional right to procedural due process of law in two specific ways. First, Ms. Marquis asserts that the Department violated her rights by failing to conduct her hearing within the time limits set by its own regulation. She argues that the time limit is mandatory and that a violation thereof warrants that the Substantiation be vacated. Second, Ms. Marquis asserts that the Department violated her rights by declining to order the production of confidential personnel files of two of the Department's witnesses, Mr. Bourque and Mr. Robbins. She claims that she was thereby prevented from exploring the issues of bias and witness credibility.

Procedural Due Process "imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the Due Process Clause of the Fifth or Fourteenth amendments. *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976). The court analyzes procedural due process claims by utilizing a two-step inquiry: first, the court determines whether the government

14

action has deprived the claimant of a protected property interest, and second, if such a deprivation occurred, the court must determine what process is due pursuant to the Fourteenth Amendment. *McNaughton v. Kelsey*, 1997 ME 182, ¶ 6, 698 A.2d 1049.

Ms. Marquis' first due process claim is based on the procedural deadlines set by the Department. Those deadlines provide that when individuals who have been substantiated at a Level I exercise their right to appeal, "the hearing on the appeal shall be scheduled as soon as possible but no later than sixty (60) days after the appeal request is made, unless he or she requests an extension." 10-149 C.M.R. ch. 1, § 7(3)(b)(iii). Here, Ms. Marquis submitted her appeal and request for hearing on March 13, 2020. Her hearing was originally scheduled for June 30, 2020, more than 60 days later.[4] She claims that the 60-day requirement is jurisdictional (i.e., mandatory) rather than directory and that her Notice of Substantiation should have therefore been dismissed.

As noted above, the court gives considerable deference to an agency's interpretation of its own rules, regulations, and procedures. *Beauchene*, 2009 ME 24, ¶ 11, 965 A.2d 866. Where an agency's procedural deadlines are concerned, "language such as 'shall' is directory, not mandatory, and does not wrest from the agency jurisdiction to act if the deadline is not met," unless the rule contains explicit language to the contrary. *Doe v. Bd. of Osteopathic Licensure*, 2020 ME 134, ¶ 11, 242 A.2d 182. Here, 10-149 C.M.R. ch. 1 does not contain explicit language requiring dismissal in the event of a delay. Both the Recommended Decision and the Final Decision in this case found that, in the absence of such language, "the rule should be deemed directory and a dismissal is not required." (CR 1, 33.) This Court finds that the Department's interpretation is reasonable, and therefore affirms its conclusion that the deadline is directory. The brief delay does not require that Ms. Marquis' substantiation be vacated.

---

[4] This time period saw the emergence of COVID-19 and the suspension of agency hearings while new, remote processes were developed. (CR 33.)

15

In essence, Ms. Marquis' second due process argument is that the Department's procedures for discovery did not adequately protect the liberty interest she had in practicing her lawful occupation. *Bd. of Overseers of the Bar v. Lefebvre*, 1998 ME 24, ¶ 15, 707 A.2d 69. Ms. Marquis claims that the Hearing Officer violated her due process rights by denying her access to the disciplinary records of Mr. Bourque and Mr. Robbins. Ms. Marquis alleges that both Mr. Bourque and Mr. Robbins should have been substantiated for their roles in Mr. F.'s death and that the lack of accountability for two Department employees shows that the investigation was biased. Specifically, Ms. Marquis accuses the Department of "shifting the blame onto [her] in a case that had received substantial publicity." Ms. Marquis argues that her lack of access to the disciplinary records prevented her from exploring this issue.

Agencies need not observe the rules of evidence observed by courts. 5 M.R.S § 9057(1). The Department's Administrative Hearing Regulations limit Ms. Marquis' discovery to a review of her own case file and all records to be used by the Department at her hearing. 10-144 C.M.R. ch. 1 § VI(H)(1). The disciplinary records sought by Ms. Marquis were not used by the Department at her hearing and were irrelevant to her case, as discussed above. The Hearing Officer's decision to deny Ms. Marquis access to those records did not violate due process.

In sum, Ms. Marquis' procedural due process rights were not violated by the Department's substantiation process. Accordingly, Petitioner's fourth and final ground on appeal fails.

## CONCLUSION

The Court declines to rescind or reduce Petitioner Marquis' Level I Substantiation. There is substantial evidence in the record supporting the Department's decision. The decision was not affected by bias, it was neither arbitrary nor capricious, and due process principles were upheld by the substantiation appeal process. Petitioner's appeal brought pursuant to M.R. Civ. P. 80C is

16

DENIED. The decision of the Department of Health and Human Services' Office of Administrative Hearings is AFFIRMED.

**Entry is:**

The Hearing Officer's decision is AFFIRMED. The clerk may enter this Order on the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: 10/4/22

John O'Neil Jr.
Justice, Maine Superior Court

Entered on the Docket: 10/11/2022

17